390 A.2d 1238

PENNSYLVANIA HUMAN RELATIONS
COMMISSION, Appellant,

v.

SCHOOL DISTRICT OF PHILADELPHIA, Appellee,

Harry & Annemarie Gwynne et al., Intervenors,

Dr. & Mrs. Albert List, Jr., et al., Intervenors.

PENNSYLVANIA HUMAN RELATIONS
COMMISSION, Appellee,

v.

BOARD OF PUBLIC EDUCATION OF the SCHOOL
DISTRICT OF PITTSBURGH, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 29, 1977.

Decided Aug. 11, 1978.

400

Justin M. Johnson, Persifor S. Oliver, Jr., Frederick A. Boehm, Alan J. Bouffard, Goehring, Rutter & Boehm, Pittsburgh, for appellant.

Jay Harris Feldstein, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION

POMEROY, Justice.

These two cases have been briefed and argued separately. They involve nonetheless a common problem—the integration of the public schools in the major metropolitan centers of this Commonwealth; they have a common point of origin—the August 17, 1972 decision of the Commonwealth Court in the case entitled *Philadelphia School District v. Human Relations Commission*, 6 Pa.Cmwlth. 281, 294 A.2d 410 (1972); and they present certain legal questions in common. For those reasons, they are treated here in a single opinion.

## PROCEDURAL HISTORY

a. *The Commission's Amended Final Orders
dated September 25, 1972*

In 1972, the Commonwealth Court considered the appeals of five school districts—including the Philadelphia and Pittsburgh School Districts—from orders of the Pennsylvania Human Relations Commission (the "Commission" or the "PHRC") directing each district to submit a plan to achieve racial balance in its public schools. After consideration of such appeals, the Commonwealth Court remanded the cases to the PHRC for modification of its orders in accordance with the Court's opinion after such further conferences, hearings, conciliation and persuasion as the PHRC deemed appropriate.[1] Neither the School District of Philadelphia ("Philadelphia" or "School District") nor the School District

1. The Court's remand of these decisions was occasioned by the PHRC's original direction that the School Districts recruit and assign an integrated staff at all levels for all schools, a requirement which the Court deemed to be without legal or evidentiary support. The Commission's Amended Final Orders deleted all provisions relating to staff integration and that issue is not presented in any way by these appeals.

of Pittsburgh ("Pittsburgh" or "School District") took an appeal from that order.[2]

Upon remand and without any further proceedings, the PHRC rendered and served upon both Philadelphia and Pittsburgh Amended Final Orders dated September 25, 1972 which, *inter alia,* required each school district to submit to the Commission by January 2, 1973 a plan that would eliminate racial imbalance in its schools in conformity with the Commission's "Recommended Elements of a School Desegregation Plan" (the "Recommended Elements") dated May 15, 1968 and in accordance with a timetable contained in its Amended Final Orders.[3]

b. *Subsequent Proceedings in the Pittsburgh Case*

Pursuant to the Commission's Amended Final Order and in accordance with an extension of time which the PHRC had granted to it, the Pittsburgh Board of Public Education submitted a school reorganization plan to the Commission on February 26, 1973. Thereafter, the PHRC advised the School District that, in the Commission's view, the proposed plan did not fully comply with the Amended Final Order, and the Commission sought clarification from Pittsburgh as to why the District could not comply.[4]

During the period from 1973 through 1976, members and representatives of the Pittsburgh Board of Public Education and of the Commission had various conferences and communications about the February 1973 reorganization plan, the

2. Such an appeal was taken by the other three school district defendants. See *Pennsylvania Human Relations Commission v. Uniontown Area School District,* 455 Pa. 52, 313 A.2d 156 (1973).

3. The Recommended Elements are a series of questions addressed to the characteristics and effects of a desegregation plan. A copy of the Recommended Elements is set forth as Appendix "A" hereto.

4. The record before this Court does not include the February 26, 1973 plan nor indicate what actions were contemplated by that plan, nor does it provide any basis for determining what specific objections the Commission had to it. The Commission never took formal action disapproving Pittsburgh's plan of February 1973 and the Commission's position with respect to that plan was of course not presented to any court for its review.

actions taken by the School District to implement that plan and certain other reorganization plans which the District had under consideration. Although the School District apparently considered various amendments or alternatives to the February 1973 plan during the three year period following its submission, no such revised plan was ever formally adopted by the Board of Education or submitted to the Commission; the February 1973 plan is the only submission from Pittsburgh to the Commission. The various conferences between Pittsburgh and the Commission did not achieve any final resolution of their disagreements, and on August 18, 1976 the Commission, acting pursuant to Section 10 of the Pennsylvania Human Relations Act (the "Act"), Act of October 27, 1955, P.L. 744, as amended, 43 P.S. § 960, filed with the Commonwealth Court a petition for enforcement of its Amended Final Order of September 25, 1972.

The Commission's petition for enforcement was answered by the School District, and the matter was argued before the Commonwealth Court.[5] The School District did not request an evidentiary hearing nor, insofar as the record before us indicates, did the District ever suggest that any evidentiary matters were pertinent to the issue before the court.[6] By

5. By way of New Matter in its Answer, the School District averred that pursuant to Act 150 of 1975, Act of December 19, 1975, P.L. ——, No. 150, a referendum had been held in the School District of Pittsburgh, the effect of which was to replace the fifteen member Board of Public Education, formerly appointed by the Court of Common Pleas of Allegheny County, with a nine member Board of Public Education elected by the voters of the School District. The members of the Board thus elected assumed office on December 6, 1976.

6. Similarly, the School District did not contend that its original reorganization plan of February, 1973 was an appropriate response to the Commission's Amended Final Order or that there was adequate justification for any aspects of that plan which were not in compliance with that Order. On this appeal, the School District has made reference to steps which it has taken to achieve increased integration in certain areas of the District, while the PHRC contends that other actions taken by the School District have actually increased the degree of segregation. No evidence was presented to the Commonwealth Court by either party with respect to the actions of the School District during the period 1973 through 1976, and the record in this proceeding is absolutely barren with respect to the

order dated January 13, 1977, the Commonwealth Court directed Pittsburgh to prepare and submit a definitive plan to the Commission "to correct racial imbalance in its schools, in accordance with the law and the Commission's guidelines." That order further directed that the School District's plan "shall conform to the requirements of the Amended Final Order" in all respects save that of the timetable contained therein; in recognition of the passage of time during the course of the negotiations between Pittsburgh and the Commission, the court, in its order, established a new timetable for desegregation which the School District's new plan was to follow. In entering its order, the court noted that counsel for both parties had indicated that "they would be amenable to a resolution of this case by an order requiring [Pittsburgh] to submit a new plan for the correction of racial imbalance in the School District."

From the Commonwealth Court's order of January 13, 1977 the Pittsburgh School District took a timely appeal to this Court. On April 11, 1977, the PHRC filed a motion to quash the appeal and a brief in support of the motion. In the interim, acting by counsel specially retained by it, the School District filed a petition for allowance of appeal, and the Commission filed a brief in opposition to that petition.[7] By order dated August 5, 1977, we reserved decision on the Commission's motion to quash and specifically directed the parties to brief and argue the following questions:

(1) Whether the School District is entitled to an appeal as a matter of right; and

(2) Whether any of the issues raised by the School District had been waived or were res judicata as a result of the prior

current status of Pittsburgh's school population or the degree to which its school population is educated in racially identifiable facilities.

7. The District's petition for allowance of appeal was superfluous in this case. Section 204(b) of the Appellate Court Jurisdiction Act, 17 P.S. § 211.204(b), provides that if an appeal is improvidently taken to this Court pursuant to section 203 of that act, the appeal shall not be dismissed but shall be acted upon as a petition for allowance of appeal under section 204(a).

proceedings before the Commission and Commonwealth Court.

c. *Subsequent Proceedings in the Philadelphia Case*

Following the entry of its Amended Final Order on September 25, 1972, the Commission granted several requests by Philadelphia for extensions of time within which that District might submit a desegregation plan. When Philadelphia failed and refused to submit any plan to the Commission after the expiration of the deadline, as extended, the PHRC filed a Petition for Enforcement of its Amended Final Order with the Commonwealth Court. After hearing, that court, by order dated November 14, 1973, granted the Commission's petition and directed Philadelphia to submit to the Commission by February 15, 1974, a plan and timetable to eliminate the racial imbalance of its schools in accordance with the Commission's Amended Final Order.[8]

Following the timely submission of a plan by Philadelphia in February, 1974, the Commission reviewed that plan and disapproved it as not being in compliance with its Amended Final Order and not containing any justification for such non-compliance as allowed in the order.[9] In consequence, on April 2, 1974, the Commission filed a second petition for

**8.** The order of the Commonwealth Court stated that the School District had represented to the court that it had a desegregation committee which together with certain staff had been working to devise a desegregation plan; that that plan would meet the requirements set forth in the Amended Final Order except as to timetable; and that such plan could be ready for submission to the Board of Education of the School District by 1973 year-end and to the PHRC by mid-February, 1974.

**9.** The record before this Court does not identify the components of the February 1974 plan submitted by Philadelphia nor does it provide any basis for determining what specific objections the Commission had to the plan. The Commonwealth Court summarized the plan as "proposing in immediate future the busing of students from seven predominantly black schools and one predominantly white school to six other schools, the possibility of other such operations in the future, and other measures, including the pairing of a 'significant number of adjacent schools which have a potential for pairing.'" See *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 23 Pa.Cmwlth. 312, 319, 352 A.2d 200, 204 (1976).

enforcement with the Commonwealth Court, requesting that the Philadelphia School District be found in contempt of the court's order of November 14, 1973, and further requesting that the court act to effectuate compliance with that order. Following a further hearing, the court issued a Memorandum Order of June 4, 1974, appointing Dr. David H. Kurtzman as an expert to examine the School District's February, 1974 plan and to provide the court with recommendations or modifications of that plan which would put it in compliance with the Commission's Amended Final Order or with reasons that would justify non-compliance. Dr. Kurtzman's report and recommendations were submitted to the court on August 29, 1974.[10] An evidentiary hearing was held by the court of that report, and both the Commission and the Philadelphia School District presented evidence in opposition to the Kurtzman recommendation. Faced with that situation, the Commonwealth Court, by order dated October 1, 1974, directed both the Commission and the School District to prepare definitive plans for the desegregation of the public schools of Philadelphia for submission to the court by January 31, 1975.

Following a number of extensions of time which the court granted to the parties, both Philadelphia and the Commission filed plans with the court in July, 1975. Plans were also

10. The Kurtzman Report, while noting various factors which constituted obstacles to the preparation of an acceptable desegregation plan in the Philadelphia School District, criticized both the PHRC and the School District for the lack of any movement toward some measure of desegregation. The Kurtzman Report envisioned a year devoted to the development of quality educational programs, physical changes which would accommodate desegregation, in-service training and staff planning, and community involvement; in subsequent years, the Report called for the creation of Educational Services Areas which would in the main embrace student populations of an acceptable racial balance and for the reorganization of the District's schools on a basis of grades (i. e., kindergarten to 4th grade, fifth to eighth grade, and ninth to twelfth grade). The Report recommended no significant desegregation for schools in Educational Service Areas which embraced roughly 25% of the school population. While recommending an outline for the desegregation efforts, the Report did not provide a detailed description of the particular school assignments which would be required by the overall desegregation concept advanced.

filed by the intervenors Gwynne and certain other interested persons.[11] Hearings on those plans were held by the court in Philadelphia in August, 1975, at which evidence was received from the parties, from the intervenors and from members of the general public. The PHRC and the School District presented support for their own plans and produced objections to the other's proposals. After argument to the full court by all concerned parties, the Commonwealth Court found that the plans submitted by the Commission [12] and by the School District [13] were unsatisfactory.[14] Accordingly, by

11. A petition to intervene in these proceedings was filed by Harry and Annemarie Gwynne and others; the petition avers that the intervenors were parents of children who were enrolled in the Philadelphia public schools and who would be affected by implementation of the Kurtzman Report. The Commonwealth Court granted that petition. The intervenors have participated in the public proceedings before the Commonwealth Court.

12. The Commission's plan was an attempt to maximize desegregation consistent with the constraint of limiting transportation of any student to a bus trip which would not exceed 45 minutes a day, each way to and from school. The Commission's plan utilized the District's existing School Planning Areas as the basic component of its reorganization and called for the mandatory assignment of students on a random basis to schools within such Areas to achieve desegregated schools. In view of the transportation constraint which the Commission accepted, certain areas of the School District which accounted for roughly 15% of the school population would not be affected by the Commission's plan. The Commission estimated that implementation of the proposed plan would entail the reassignment of approximately 40,000 elementary school students and the transportation of roughly 53,000 elementary and middle school students for distances in excess of $1\frac{1}{2}$ miles. As noted by the Commonwealth Court, the Commission's plan would actually have increased the number of schools that had a black student population in excess of 60%.

13. The District's "plan" is a five page document which states the District's view that compliance with the Amended Final Order is impossible as a practical matter; it proposes the creation of a Metropolitan School District embracing Philadelphia and school districts in adjacent counties, provided that the Commonwealth provides complete financing for the operations of that metropolitan district.

14. In summarizing the past history of the dealings between the Commission and the Philadelphia School District and the failure to obtain some progress toward desegregation, the court placed blame upon each party for its rigidity. In assessing the plans before it, the

opinion and order entered February 13, 1976, the Court "reluctantly" referred the matter back to the School District with the direction that Philadelphia ". . . make a realistic and effective proposal to integrate its schools . . ." Philadelphia was ordered to prepare and submit to the Commission for its review and approval a definitive plan and timetable for the desegregation of the Philadelphia public schools, together with a written justification for each instance in which it was proposed that a school should remain racially imbalanced. The order further required that the plan be submitted to the Pennsylvania Department of Education for its recommendations as to educational content, and that the submission to both the Commission and the Department be made by July 1, 1976. *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 23 Pa.Cmwlth. 312, 352 A.2d 200 (1976).

Following a one month extension granted by the court, Philadelphia submitted its July 1976 Desegregation Plan (the "1976 Plan") to the Commission. Thereafter, the Commission reviewed the 1976 Plan with the Department of Education and with representatives of the School District. The Commission notified the District of certain concerns which it had about the 1976 Plan, and the District responded to some of them. On September 27, 1976, the Commission officially voted to disapprove the 1976 Plan and again initiate enforcement proceedings in the Commonwealth Court.[15]

court concluded that the Commission's plan was "without educational content or community contribution and, in our judgment, requires more to be done than its practical effect on the 115 schools having 90 percent or more black students justifies." *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 23 Pa. Cmwlth. 312, 331, 352 A.2d 200, 211 (1976). It concluded that the School District's plan was "certainly beyond our power to compel and must be rejected."

15. On or about October 7, 1976 and after the Commission's disapproval of the submitted plan, the Pennsylvania Department of Education submitted its review of the 1976 Plan to the District. The Department did not question the educational content of the Plan when viewed apart from its desegregation intent, but it expressed reservations that the 1976 Plan would achieve significant desegregation of the Philadelphia school system.

Accordingly, on November 18, 1976, the Commission filed a third petition for enforcement seeking implementation of its Amended Final Order of September 25, 1972 and of the prior orders of the Commonwealth Court.

In response to that petition, the court convened a hearing on January 13, 1977, at which both parties presented testimony and evidence. Following argument upon the enforcement petition and the legal sufficiency of the 1976 Plan, the Commonwealth Court denied the Commission's petition for enforcement and directed the School District to implement the 1976 Plan, as submitted. *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 30 Pa. Cmwlth. 644, 374 A.2d 1014 (1977). The Commission's appeal to this Court followed.

## THE STATUS OF THESE APPEALS

■ At the outset, we are confronted with the anomaly of a motion to quash filed by the Commission in response to Pittsburgh's appeal from the Commonwealth Court order granting the Commission's petition for enforcement and a roughly contemporaneous direct appeal by the Commission from the Commonwealth Court order denying the petition for enforcement which the Commission filed in the Philadelphia case.[16] We conclude that the instant orders are appealable to this Court pursuant to the terms of Section 203 of the Appellate Court Jurisdiction Act of 1970, Act No. 223, July 31, 1970, P.L. 673, 17 P.S. § 211.203.

Section 203 provides that this Court "shall have exclusive jurisdiction of appeals from all final orders of the Common-

On November 10, 1976, the PHRC formally notified the School District of its objections to the 1976 Plan. Certain of those objections related to matters as to which the School District had previously indicated its agreement with the Commission's position.

16. Although the Commission has not withdrawn its motion to quash in the Pittsburgh proceeding, it has advised the Court that it does not wish to press or brief the issue of the appealability of the order. The question of this Court's jurisdiction is nonetheless properly before the Court as a threshold issue in both cases. E. g., *Marshall v. Powers*, 477 Pa. 306, 383 A.2d 946 (1978); *McGee v. Singley*, 382 Pa. 18, 22, 114 A.2d 141 (1955).

wealth Court entered in any matter which was originally commenced in said court and which does not constitute an appeal from . . . an administrative agency . . ."

Each of these cases involves "final order[s] of the Commonwealth Court." In the Philadelphia action, the Commonwealth Court has denied the relief sought by the Commission; in the Pittsburgh action, the court has denied the School District's request for relief and has required it to take certain further affirmative steps. In each case, the court's order disposes of the entire matter before the court, and no piecemeal review is at issue. See *Piltzer v. Independence F. S. & L. Assn.*, 456 Pa. 402, 319 A.2d 677 (1974).

Moreover, we conclude that an enforcement proceeding which the PHRC initiates before the Commonwealth Court constitutes a matter which is "originally commenced" in that court and that an appeal from the order of the Commonwealth Court which disposes of such an enforcement proceeding is not "an appeal from . . . an administrative agency." *See* Section 203, *supra,* of the Appellate Court Jurisdiction Act. The proceedings in these matters have, of course, been pursued by and before the Commission itself, have involved extended conciliation efforts, the filing of a complaint, evidentiary hearings, extensive submissions, the review of submitted plans and negotiations concerning such plans, and of course the entry of various orders by the Commission. In both of these cases, however, the issues presented by the petitions for enforcement were originally addressed in the Commonwealth Court.[17] The issues presented by these appeals do not directly involve determinations by the Commission itself; rather, they involve determinations by the Commonwealth Court—that Philadelphia has substantially complied with the court's prior orders and that Pittsburgh is required to submit a desegregation plan pursuant to the Commission's Amended Final Order. The

17. The pleadings in that court have framed the issue before us, and to the extent that the parties deemed it appropriate they have submitted to us testimony and evidence presented to the Commonwealth Court in support of their respective positions.

issues presented by these appeals have not previously been presented to an appellate court. Accordingly, we believe that these appeals are embraced by Section 203 of the Appellate Court Jurisdiction Act and are appealable to this Court as of right. See *Commonwealth of Pennsylvania, Department of Environmental Resources v. Wheeling Pittsburgh Steel Company,* 473 Pa. 432, 375 A.2d 320 (1977).

## THE MERITS OF THESE APPEALS

### a. *The Pittsburgh Case*

The January 13, 1977 order of the Commonwealth Court directs Pittsburgh to submit to the Commission "a definitive plan to correct racial imbalance in its schools, in accordance with the law and the Commission's guidelines." That order sets forth with some specificity the nature of the plan which the School District shall follow and the procedures which shall apply to its review: it establishes a date for the submission of that plan; it directs that the plan shall "conform to the requirements of the Amended Final Order"; it establishes a timetable for the elimination of racial imbalance which the plan shall meet; it requires the submission of the plan to the Department of Education for comment; it requires the Commission to approve or disapprove of the plan in whole or in part with any objections to be set forth in writing with specificity; and it provides for the court's retention of jurisdiction over the matter.

In its opposition to the Commonwealth Court order, Pittsburgh advances a variety of arguments: that the filing of a desegregation plan is not mandated by statute or regulation; that the Commonwealth Court exceeded its jurisdiction under Section 10 of the Act by entering a new order which did not modify an order of the Commission and by failing to take testimony in connection with its entry of that order; that the order appealed from is contrary to law. In addition, the District contends that the order as drawn fails to take into consideration certain particular problems which the School District may have in achieving the pre-

scribed degree of desegregation on the time schedule in question, requires more of the District than is practical or feasible, and departs from the case-by-case consideration of such matters mandated by statute and by this Court's prior decisions.[18]

To a significant degree, much of the argument presented on behalf of the School District is either belated or premature.

Certain of the positions advanced by the District have either been settled adversely to the District as a matter of general law or, as explained more fully below, text at n. 19, were resolved by the District's prior appeal from the Commission's final order. *School District of Philadelphia v. Pennsylvania Human Relations Commission,* 6 Pa.Cmwlth. 281, 294 A.2d 410 (1972). Other positions advanced by the District cannot be resolved in the context of the present order requiring the submission of a plan but only in connection with a determination as to whether a particular plan which the District may submit is satisfactory.

As an initial matter, Pittsburgh contends that it may not be required to file a plan with the Commission and that the Commonwealth Court was without power to order that it do so. As a general proposition, however, the power of

18. Appellant Pittsburgh also appears to contend that the change in the manner of selection of individual Board members from an appointive system to an elective system justifies the return of this matter to the initial point of departure and in some respect vitiates all prior proceedings. That argument is without merit. The prior Board, no less than the present Board, was the duly constituted authority for conducting the affairs of the School District; the present Board, no less than its appointed predecessors, is subject to the applicable laws of the Commonwealth.

Appellant also contends that the court erroneously assumed that the School District was amenable to disposition of this matter by an order requiring the submission of a plan. Nothing of record contradicts the court's statement that counsel who represented the School District before the Commonwealth Court made such a representation to the court. Moreover, in view of the court's power to enter the order in question on the basis of the present record and the absence of any material controverted facts, we do not deem it appropriate to remand the matter to the Commonwealth Court for reconsideration of the School District's position as requested by its present counsel.

the Commission to require a school district to prepare and submit a plan which addresses the problems of school segregation in a realistic and meaningful fashion is a settled issue. The power of the Commonwealth Court to enforce such orders of the Commission is equally settled. Indeed, Pittsburgh concedes that, under existing case law, the Commission may take action against racial segregation which is found to exist within the student population of a school district within the Commonwealth. *See* Pennsylvania Human Relations Act, §§ 5(i)(1) and 9, Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §§ 955(i)(1) and 959; *Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 313 A.2d 156 (1973); *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 233 A.2d 290 (1967); see also, *Balsbaugh v. Rowland,* 447 Pa. 423, 290 A.2d 85 (1972).

Moreover, the Pittsburgh School District has heretofore unsuccessfully challenged the Commission's power to order it to submit a plan to achieve racial balance in its public schools. The Commission's final order of June 18, 1971 (the subject of the appeal by Pittsburgh which was decided adversely to it in *School District of Philadelphia v. Pennsylvania Human Relations Commission,* 6 Pa.Cmwlth. 281, 294 A.2d 410 (1972)) paralleled almost precisely the order of the Commonwealth Court here under review and was subject to a substantially similar attack by the School District. As indicated above, the District's appeal from the Commission's original final order was denied, and no appeal was thereafter taken by the District from that adjudication.[19] Thus, the basic power of the Commonwealth, through its instrumentalities, to act in this area is established, and the School District's present challenge to that power is doubly belated by reason of the prior proceedings in this matter.

Moving from its general attack upon the powers of the Commission and the Commonwealth Court to a more partic-

**19.** Similar challenges were pressed further by the other school districts involved in that case and were rejected by this Court on appeal. See *Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 313 A.2d 156 (1973).

ular attack upon the nature of the order at issue, the Pittsburgh District contends that the court's order of January 17, 1977 is erroneous in two respects: (i) the court ordered a new timetable which the District's projected plan would be required to reflect without there having been an evidentiary hearing on the timetable; and (ii) the court failed to take into consideration particular problems which the District would face in complying with any such order.

■ With respect to the first point, we believe the court was clearly within its rights in entering a new timetable without an evidentiary hearing. The timetable in question parallels the timetable contained in the Commission's original final order which was, in the main, upheld by the Commonwealth Court in 1972, *supra*, 6 Pa.Cmwlth. 281, 294 A.2d 410, and in the Amended Final Order which the Commission entered upon remand of the matter from the Commonwealth Court. The order in question merely takes into account the time which had elapsed while the District's prior plan was in preparation by the School Board and under review by the Commission and while the Board and the Commission were engaged in negotiations over the most effective way to move against segregation within the Pittsburgh school district. In view of the averments contained in the petition for enforcement and the School District's response thereto, it is not clear what basis there might have been for an evidentiary hearing, and as noted above, the record before us contains no suggestion that the School District ever requested such a hearing or sought to present additional evidence to the Commonwealth Court. We find no error in the Court's disposition of the petition for enforcement and its entry of an order without holding a further evidentiary hearing.

■ The School District's second contention, on the other hand—that the court's order fails to take into consideration various factors which make it impossible for Pittsburgh to desegregate its schools in such a fashion as to comply fully with the Commission's Guidelines—is, in the main, premature. The District is being directed to devise and submit for

review a plan; it has not been required to take particular actions to implement such a plan, and the plan which it submits, together with any action by the Commission thereon, will be subject to further judicial scrutiny. In the initial proceeding before the Commonwealth Court, the court took cognizance of the contention, pursued principally by the Philadelphia School District, that full scale desegregation was beyond the District's fiscal resources; the court noted that such matters could not be reasonably assessed until a minimum acceptable plan had been prepared and analyzed. A similar response is appropriate in this case. While there may be circumstances which provide persuasive justification for the acceptance and implementation of a plan which fails to achieve complete desegregation of Pittsburgh's schools, such factors should be offered in justification of a particular plan and not in defense of an order which merely requires the initial submission of a plan.

 In one respect, however, we believe the position advanced by the School District[20] is meritorious, i. e., the degree to which the Commonwealth Court's order appears to incorporate the Commission's "Recommended Elements" and to mandate an adherence to those Elements which is more stringent than the Commission itself would require.

Initially, it should be noted that the status of the Recommended Elements has recently been considered by this Court, and the Court's rulings on that issue were not available to the Commonwealth Court at the time it entered its order of January 17, 1977 from which this appeal is taken. See *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671 (1977). In that case, the defendant school district challenged the Commission's Recommended Elements as an invalid regulation which had been promulgated by the Commission without regard to the publication requirements of the Administrative Agency Law, as superseded by the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, No. 240, as amended, 45 P.S. § 1101 *et seq.* This Court noted that the

20. *See* appellant Pittsburgh's brief at 13–15 and 17–18.

Commission had taken the position that the guidelines were not in fact binding administrative regulations having the force of law but were rather "general policy statements . . . made . . . to aid school districts in developing plans which the Commission will find acceptable." *Id.* 473 Pa. at 347, 374 A.2d at 678. This Court then quoted with approval the following observation of Commonwealth Court:

> "The Commission's document, 'Recommended Elements of a School Desegregation Plan,' as its title suggests, does not lay down hard and fast standards with which districts must comply in order to conform to the law. It merely poses questions concerning the plan for integration as means of testing the plan's chances of proving acceptable to the Commission. The questions are most general in nature and there is nothing in the document which states or implies that nonconformity of the plan in any respect will bring automatic rejection." *Id.* 473 Pa. at 348, 374 A.2d at 678, quoting *Pennsylvania Human Relations Commission v. Norristown Area School District*, 20 Pa.Cmwlth. 555, 560, 342 A.2d 464, 467 (1975).

Moreover, the Commonwealth Court in the *Norristown* case had noted that the Commission's order was "inconsistent with the Commission's position that the guidelines were statements of policies and not binding regulations." In response to that decision, the Commission modified its order to "permit Norristown to develop and submit a desegregation plan which did not conform to the 'Recommended Elements of a School Desegregation Plan' if persuasive justification was presented." *Id.* 473 Pa. at 348, n. 29, 374 A.2d at 679, n. 29. This Court granted the Commission leave to supplement the record and to file its order, as amended, with the Court; it is that modified order which this Court upheld.

The same inconsistency between the order at issue on the one hand and the position of the Commission (and the status of the Recommended Elements) on the other is apparent in the case at bar. The January 13, 1977 order of the Common-

wealth Court requires the District to submit a plan which is in accordance with "the Commission's guidelines" and with the Commission's Amended Final Order; the Amended Final Order in turn incorporates by reference and requires compliance with the Commission's Recommended Elements. As noted above, Pittsburgh contends that such requirements effectively determine the nature of the plan, without taking into account the recent developments in Pittsburgh or the particular problems which the School District may have in complying with such an order. In response, the Commission stresses that it "has never maintained that the Recommended Elements are hard and fast standards to which Districts must adhere or that noncompliance will bring automatic rejection of a plan." (Brief, p. 19). It expressly endorses the view stated by this Court in the *Norristown* case, *i. e.*, that "the Elements are statements of policy indicative of a plan's chances of proving acceptable to the Commission" and it represents that the Commission itself will proceed in this case as in other cases in accordance with its statutory mandate calling for a case-by-case examination of particular local problems and projected remedies.

In view of the decision in *Norristown, supra,* and in view of the clear inconsistency between the Commission's representation that the Recommended Elements are flexible guidelines and the provisions of the order of the Commonwealth Court mandating strict adherence to the Recommended Elements, we believe it appropriate to remand this matter to the Commonwealth Court for the entry of an order consistent with this opinion.[21]

That order should make clear the District's obligation to prepare and submit a plan which addresses the problem of school desegregation in good faith and in realistic fashion. The District's Plan should take into account the Recommended Elements and the significance they will have for the deliberations of the Commission in its review of the plan.

21. As indicated in the mandate, *infra* at 1254, Mr. Justice NIX, Mr. Justice ROBERTS and Mr. Justice MANDERINO would not remand, but would have this Court enter such modified order as it deems appropriate.

The order should, however, provide some degree of flexibility in recognition of the fact that a plan which fails to satisfy some aspect of the Recommended Elements may prove acceptable if the District demonstrates that substantial and persuasive justification exists for any such departure.

b. *The Philadelphia Case*

The 1976 Plan submitted to the PHRC by Philadelphia is an attempt to achieve desegregation in the Philadelphia schools on a wholly voluntary basis. The 1976 Plan calls for an intensive planning and refinement of the Plan's components during the school year 1977–78, followed by implementation of the following programs beginning with the school year 1978–79: magnet schools; an open enrollment/voluntary transfer program; inter-system cooperation between the public and parochial schools; and the creation of skill centers and other new or expanded programs. Certain of these programs would involve participating students in integrated settings for some but not all of their school days. Participation in all of these programs would be left to the individual choice of the students and their parents. The 1976 Plan contained projections of the numbers of students that the School District anticipated might participate in the different Plan elements. Given the voluntary character of the Plan and its elements, the 1976 Plan could not identify with certainty the degree of desegregation that would result from its implementation; the District's projections, however, reflect a potential desegregating impact on anywhere from 70,000 to 160,000 of the District's 265,000 students over the course of the 1976 Plan's implementation.[22] The Plan did not indicate what response the School District would have if the various program elements failed to secure a degree of desegregation which it deemed satisfactory.

In addition to these program elements, the 1976 Plan anticipated that four categories of schools within the District were to be excluded from its operation and were to be

22. The record indicates that approximately 35,000 students are now enrolled in schools which meet the PHRC Recommended Elements.

allowed to continue to exist as they had previously. These four categories were as follows: 1) Special Education Centers, those drawing city-wide and serving a specific pupil population requiring special services; 2) schools with concentrations of Spanish surnamed pupils (20% or more) and with special language problems; 3) schools not quite meeting the Human Relations Commission's .guidelines as desegregated schools but which have a degree of racial balance and which have high achievement levels based on standardized Test Scores; and 4) schools meeting the Pennsylvania Human Relations Commission's guidelines as desegregated schools. Approximately 60,000 students are currently enrolled in the schools in these four categories.

In response to the 1976 Plan, the PHRC advised the School District in writing that there were twelve matters which constituted "some of the factors which must be considered by the district in preparing a plan which will be acceptable to the Commission." By letter dated September 23, 1976, the District advised the Commission that the Board of Education had agreed to commit itself in principle to nine of those factors.[23] With respect to the remaining three factors the District advised the Commission that the Board of Education would consider certain involuntary reassignments

23. The identified factors which the School District accepted in principle were the following: development of a definition of desegregated schools; development of a timetable for implementation, including the number of students and/or schools which would be desegregated in particular years and the program elements which would be implemented in particular years; the use of site selection for program elements to foster desegregation; the use of school closings and construction to foster desegregation; the development of a system for monitoring, and for reporting to the PHRC and the Philadelphia Department of Education, the desegregation and educational effects of the program elements included in the Plan; and the designation of administrative responsibility for the implementation and supervision of the Plan.

The District's response also noted that, although community involvement was not one of the factors identified by the PHRC in its written response, such involvement had been raised as a necessary factor in meetings between District and Commission representatives; the District advised the Commission that it believed such involvement was essential to the implementation of the Plan.

at the meeting of the Board to be held in October, 1976,[24] but that the Board had not endorsed the Commission's recommendation that it develop an involuntary reassignment contingency plan and that the Board was not fully in accord with the Commission with respect to racial admissions controls.[25] Finally, the School District advised the PHRC that the Board of Education was willing to continue to work with the Commission in the further development of the 1976 Plan.

As recited above, the Commission disapproved Philadelphia's 1976 Plan, and explained its reasons for so doing by letter to the School District dated November 10, 1976.[26]

24. One of the factors identified by the Commission was the involuntary reassignment, by the beginning of the school year 1977–78, of students "attending segregated schools in contiguous school attendance areas by redrawing attendance boundary lines, pairing, or any other method selected by the district." The District advised the PHRC that it intended to vote on the involuntary desegregation of contiguous schools at its October 1976 meeting and that it was considering in this connection the pairing of four sets of two schools apiece.

25. By an evenly divided vote the Board of Education had declined to endorse the Commission's recommendation that the District commit itself to the involuntary reassignment of pupils to accomplish desegregation in the event that the District's desegregation goals were not met by voluntary means.

The Board accepted the PHRC's recommendation that it adopt racial admission controls that would give preference in admissions to program elements to students attending an already segregated school in which their race is in the majority, but it declined to accept the PHRC's recommendation of racial admissions controls whereby students would be selected for each program element and site to ensure a non-segregated racial mix of participants.

26. The Commission's letter states the basis for its disapproval as follows:

"The Board's failure . . . to commit itself to desegregate the District by involuntary means should the voluntary programs fail, to provide assurances that a control would be maintained over admission to program elements to guarantee their desegregation, and to guarantee that students who attend schools in contiguous attendance areas would be reassigned to accomplish desegregation, made the Plan unacceptable. Moreover, your refusal to accept these principles renders any further discussion on specifics meaningless."

With respect to racial controls, the Commission's specification of objections stated that such controls might be established "by giving

Thereafter, the PHRC filed the petition for enforcement, and, as noted above, the Commonwealth Court denied that petition, approved the District's 1976 Plan and ordered its implementation, while retaining jurisdiction over the action. The court specifically stipulated that in the event the Commission determined by February of 1980 that the Plan was not accomplishing desegregation as required by Pennsylvania law, the Commission might petition the court for such further action as it deemed appropriate.

■ The issue before us is whether the Commonwealth Court erred in finding that the School District's submission of the 1976 Plan constituted adequate compliance with that court's order of February 13, 1976 directing that the School District "make a realistic and effective proposal to integrate its schools."

The Commission vigorously contends that the Commonwealth Court abused its discretion and committed an error of law in approving the 1976 Plan. Our reading of the record before this Court belies the Commission's contention that the Commonwealth Court's conclusion was without support in the record. We conclude that the court had a sufficient basis for its approval of the 1976 Plan and that no abuse of discretion or error of law was committed. Accordingly, we affirm the order of the Commonwealth Court.

students attending an already segregated school in which their race is in the majority a preference in admission to program elements, and by other means." As noted above, the District had committed itself in principle to the concept of preferential admissions standards and at the hearing before the Commonwealth Court counsel for the School District stated that the District agreed that racial admissions controls and the monitoring of admissions to program elements would be necessary.

. In view of that commitment and the Commission's failure to identify any other technique of racial admission controls, the extent of the actual disagreement between the School District and the Commission on this point is not clear. Thus, the issues of an involuntary assignment contingency plan and the involuntary reassignment of students in contiguous districts appear to be the central issues in the dispute between the PHRC and the Philadelphia School District.

As noted above, the extended discussions and negotiations between the Commission and the School District have left essentially three points in dispute: (i) the District's unwillingness to develop an involuntary reassignment plan for implementation in the event the voluntary aspects of the 1976 Plan prove ineffective; (ii) the District's unwillingness to achieve some immediate desegregation by means of pairing schools or redrawing the lines of contiguous school attendance districts; and (iii) the District's identification of four categories of schools which were outside the operation of the Plan.

The first of these issues—the absence of any involuntary reassignment component—is part and parcel of the Commission's conviction that the proposed voluntary plan elements will prove ineffective. In that connection, the PHRC contends that the Commonwealth Court's "refusal to be guided by the uncontradicted testimony of the Commission's expert witness concerning the failure of voluntary desegregation plans in other school districts" compels the conclusion that the court had erred. At the hearing before the Commonwealth Court, the PHRC placed principal reliance upon the testimony of its expert, Dr. Gordon Foster.[27]

Dr. Foster stated his objections to, and his reservations concerning the likely efficacy of, the 1976 Plan and its reliance upon voluntary techniques. He prefaced his testimony, however, with the following observation:

"First of all, I'd certainly like to state that volunteerism in the North and West is certainly not a closed chapter. It's something that is experimental and several districts are trying it with different failures and successes. A lot of people feel that it may make a certain amount of sense in different ways and it is an experimental program and certainly nobody can definitively say it doesn't work or it works or whatever at this juncture."

27. Dr. Foster was employed at the Florida School Desegregation Center at the University of Miami (Fla.). He was the principal author of the July 7, 1975 desegregation plan which was submitted by the PHRC to the Commonwealth Court. As noted *supra*, pp. 1242–1243, the Commonwealth Court in its order of February 13, 1976 declined to direct the implementation of that plan.

In the face of that general disclaimer, Dr. Foster stated his opinion as to the desegregation potential in the various proposed program elements of the 1976 Plan. With respect to magnet schools, Dr. Foster testified that "the possibilities of considerable desegregation over a period of time certainly would be fair in this program." He further testified that he believed the School District's estimate of 40,000 potentially affected students was "pretty optimistic" because of the locations of the schools which had been tentatively suggested as magnet schools. With respect to open enrollment and voluntary transfers, Foster testified that programs of that type had traditionally drawn no more than 3% to 5% of a district's pupils; that range, if accomplished, would coincide with the lower range of the School District's own estimate of the potential for this phase of the program. Dr. Foster testified that the District's proposed inter-system and shared-time programs would affect a small number of students and in his opinion did not involve genuine school desegregation but simply part-time desegregation. Finally, Dr. Foster testified that of the balance of the proposed educational components, the "academics plus" program offered some effective solution to desegregation but that the remaining programs had not been sufficiently worked out to allow a reasonable projection of their desegregation effect.

In conclusion, Dr. Foster gave it as his opinion that, based on the experience of other school systems around the country, "the chances are that a completely voluntary plan by itself would achieve some measure of desegregation. I don't think any of us know how much." Dr. Foster then stated his "guess" that the 1976 Plan would result in desegregation of between 10% and 15% of the school population; he thought that volunteerism combined with some measure of actual mandated desegregation would "make all the sense in the world."

With respect to the second major issue—the absence of any immediate desegregation obtained through involuntary pupil assignments—the PHRC placed principal reliance upon the testimony of Richard B. Anliot, the Commission's Di-

rector of Education. Anliot testified that as an initial matter the School District might achieve substantial immediate desegregation by means of pairing thirty-three schools having 23,000 students. Anliot conceded on cross-examination, however, that several of the pairings proposed by the Commission itself would not yield schools which were desegregated in accordance with the Commission's guidelines. Indeed, the evidence presented by witnesses called by the School District indicated that six of the PHRC's sixteen proposed pairings (involving fourteen of the schools in question) would not bring the schools within the Commission's guidelines [28] and that seven other proposed pairings (involving fifteen schools) would entail significant traveling distances between the attendance districts, the potential disruption of special programs at certain of the schools or disparities between the grade level organization of the schools in question. Thus, the evidence before the Commonwealth Court identified only five potential pairings involving less than 7,000 students which were not subject to substantial dispute.

Over against the testimony offered by the Commission with respect to the prospects of voluntary desegregation and possible mandatory assignments, the School District offered evidence from the president of the Philadelphia Home and School Council, an organization representing the parents of Philadelphia school district children, to the effect that the Council endorsed the District's proposed voluntary plan and was prepared to work towards its success; the District's Coordinator of External Operations, who had had responsibility for preparing the 1976 Plan, also testified as to the District's belief that the voluntary program elements were more likely to obtain support and prove successful if they

28. Several of these proposed pairings involved the merger of identifiably black schools with schools having a population of predominantly Spanish surnamed students. The pairings of such schools would have resulted in small white student populations and would have failed to satisfy the Commission's Recommended Elements or the Commission's alternative endorsement of schools having at least 20% white, 20% black and 20% Spanish surnamed students. See *infra,* note 31.

were not combined with involuntary elements or contingency plans which were likely to attract substantial opposition.

With respect to the third issue of dispute—the District's exclusion of four categories of schools from the Plan's operation [29]—reference should again be made to the testimony of Dr. Foster. Dr. Foster testified that he found nothing objectionable in the District's proposed exclusion of schools drawing from the city as a whole and having a student population requiring special services or in its exclusion of schools which met the PHRC's guidelines as desegregated schools.[30] With respect to the category of schools having more than twenty percent Spanish surnamed students, Dr. Foster testified that in his opinion such schools should be desegregated (i. e., the Spanish surnamed students should be dispersed) in a way that would guarantee a continuing quality of bilingual education, but he also testified that certain of the schools in question already met the Commission's desegregation guidelines. Moreover, Dr. Foster stated that in his opinion some deviation from the Commission's Recommended Elements was warranted in situations involving ethnic isolation, i. e., significant concentrations of Spanish surnamed students.[31]

**29.** The four categories are described above at p. 1249.

**30.** On this latter point, Dr. Foster's position is somewhat inconsistent with that of the PHRC. Dr. Foster testified that absent unusual circumstances, "you would leave a desegregated school alone and not change the student body." The Commission's letter of November 10, 1976 stating the basis for its disapproval of the 1976 Plan states that the exemption from the Plan of schools which already met its guidelines could not be accepted without an agreement by the District to adopt the PHRC's guidelines for the entire Plan.

**31.** The Commission's Recommended Elements do not speak to the issue of ethnic isolation and its complexities; by their own terms, they deal only with the problem of undue racial concentrations and the percentage of black students in a particular school population. It is not clear what standards, if any, the Commission believes appropriate to situations of "ethnic" as distinguished from "racial" isolation.

Dr. Foster noted that the Commission's 1976 Plan, which he had prepared, would have deemed a school acceptable if its student body was at least 20% black, 20% Spanish surnamed, and 20% "other", and he stated his belief that the Commission would accept such a

In sum, ninety-one schools were embraced by the four categories which the School District intends to leave outside the operation of the 1976 Plan; the testimony offered by the PHRC with respect to these categorical exclusions indicates that more than two-thirds of the exclusions were unobjectionable to and deemed warranted by the Commission's own expert. Thus, even with respect to this point of dispute, the actual difference between the District and the Commission is substantially narrower than at first appears.

In approving the District's 1976 Plan, the Commonwealth Court noted its understanding of the PHRC's concern that the Plan might not effect a sufficient level of integration. It stated its reluctance to mandate specific school pairings or specific student transfers until "those charged with the responsibility of administering the schools have had a reasonable opportunity to implement a plan which they feel will accomplish desegregation with a minimum of disruption and a maximum of educational value." [32] While we share the concern of that court as to the degree to which the Plan may accomplish desegregation, we cannot find on the present record that the court erred or abused its discretion in concluding that the Plan sufficiently complied with the court's own order of February 16, 1976 and was worthy of implementation.

■ On the record before it, the Commonwealth Court had (1) evidence from the Commission that a plan of volun-

position. Use of that standard would mean that a school with a population that was 60% white and 40% black would be considered "racially" imbalanced, while a school population that was 20% white, 60% black, and 20% Spanish surnamed would be considered "racially" balanced.

Application of Dr. Foster's standard to the twenty-three schools which had a Spanish surnamed population in excess of 20% would mean that none of the eight schools which meet the Commission's Recommended Elements had student bodies which Dr. Foster deemed acceptable, while five other schools which did not satisfy the Recommended Elements had a student mix which satisfied Dr. Foster's standard.

32. Both Dr. Foster in his testimony before the Commonwealth Court and the Commonwealth's Department of Education endorse the Plan's elements from an educational point of view.

tary desegregation would achieve some measure of desegregation, the degree of which was beyond anyone's knowledge; (2) evidence from the School District that such a plan would be most likely to elicit support from the constituencies of the schools; (3) evidence from the Commission and from the School District that the Commission's own proposed school pairings in many cases failed to achieve the intended level of desegregation or were subject to other substantial criticism; and (4) evidence that the District's proposed exclusion of certain schools from the operation of the Plan was, in the main, acceptable to the Commission's own witness. That evidence must be viewed in the light of the Commonwealth Court's prior experience with the problem before it: in the preceding eight years, the parties had been unable to resolve their differences and produce a mutually satisfactory plan of desegregation; during that same period, neither the School District nor a distinguished outside expert nor the Commission itself had been able to formulate an acceptable plan. Finally, that evidence must be viewed in the light of this Court's long-held position that "the School District bears primary responsibility for the choice and implementation of an effective desegregation program." *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 181, 233 A.2d 290, 302 (1967).

In view of the evidence before the Commonwealth Court, its extensive experience with the disputes in question and the applicable legal standards, we cannot conclude that the Commonwealth Court erred or abused its discretion in approving Philadelphia's 1976 Plan, directing its implementation, and retaining jurisdiction over the matter for the purpose of considering the actual success of the 1976 Plan in operation. If, in practice, the Plan fails to achieve an acceptable level of desegregation or if the Plan is not in fact implemented in good faith, the Commonwealth Court may take such further action as is required. What is required at this point is a plan which can be put into operation and which can move the present situation off dead center. The Commonwealth Court's order achieves at least that much.

We echo its hope that this plan, in Judge Wilkinson's words, "may well be 'the light at the end of the tunnel.'" If by February 1980 this hope is disappointed, it will then be necessary for the Commonwealth Court to take "such further action as it then deems appropriate."

## CONCLUSION

### *Appeal at No. 103 March Term, 1977* (The Pittsburgh case)

In this appeal the order of the Commonwealth Court entered January 13, 1977 is affirmed insofar as it directs the School District of Pittsburgh to submit to the Pennsylvania Human Relations Commission a definitive plan to correct racial imbalance in its schools. With respect to the remainder of said order the six justices participating in the decision of that appeal are evenly divided:

EAGEN, C. J., and O'BRIEN and POMEROY, JJ., would vacate the same and remand to the Commonwealth Court for modification thereof in accordance with Mr. Justice POMEROY's opinion (see *supra* at 1248), and for such further adjustment of the time schedule for compliance as may be appropriate in light of the time consumed by this appeal.

ROBERTS, NIX and MANDERINO, JJ., would also vacate the remainder of the order in the Pittsburgh case, but, instead of remanding, would have this Court enter a final order which incorporates the modifications it deems proper, as set forth in Part III of the dissenting opinion of NIX, J., *infra.*

LARSEN, J., did not participate in the consideration or decision in the case at No. 103 March Term, 1977.

PACKEL, former J., did not participate in the decision in the case at No. 103 March Term, 1977.

*Appeal at No. 572 January Term, 1977*
(The Philadelphia case)

The order of the Commonwealth Court entered July 1, 1977 is affirmed.

NIX, J., files a dissenting opinion with respect to both appeals in which ROBERTS and MANDERINO, JJ., join.

## APPENDIX "A"

### MAY 15, 1968

*Recommended Elements of a School Desegregation Plan*

by

Pennsylvania Human Relations Commission

and

Department of Public Instruction

1. Does the desegregation plan indicate the projected racial composition of each elementary and secondary school attendance area and the racial composition of the total staff of each building as of the completion dates of each step?

2. Does the desegregation plan identify the location of proposed school building construction sites?

3. How nearly does the desegregation plan bring the per cent Negro pupils in each building to within 30% of the per cent Negro pupils among the buildings of the same grade span?

4. Does the desegregation plan include procedures to affirmatively and effectively recruit and assign an integrated staff at all levels for all schools?

5. Does the desegregation plan correct any untoward concentrations of professional or non-professional Negro staff in any buildings?

6. Does the desegregation plan equally match the services of its professional staff and program with the educational needs of each school building?

APPENDIX A—Continued

7. Does the desegregation plan include plans for in-service training of staff to meet the needs and problems incident to the implementation of desegregation plans?

8. Does the desegregation plan include steps to include intergroup education programming and the inclusion of the contributions of Negroes and other racial and ethnic groups in the history courses about Pennsylvania and the United States?

9. Does the desegregation plan include a timetable indicating deadline dates by which each step will be completed? Are these dates as early as possible?

10. Does the desegregation plan indicate involvement of the community in its development and implementation?

11. Is the desegregation plan consistent with the Long Range Development Plan submitted to the Department of Public Instruction?

NIX, Justice, dissenting.

In view of the ten year history in which these two School Districts have resisted their obligation to devise and implement a realistic and effective desegregation plan for their respective districts, I am at a loss to understand the Commonwealth Court's and this Court's willingness to accept a *belated voluntary plan* as being in compliance with the previous directives of the Pennsylvania Human Relations Commission (Commission) and the prior orders of the Commonwealth Court. I fail to perceive any transformation that could cause a reasonable person to believe that a District which has demonstrated such reluctance in the past to come to grips with the serious problems of racial imbalance within its school population will now, without any coercive stimulant, aggressively seek the eradication of this evil. The majority opinion fails to reach the critical issue presented in these appeals, i. e. the scope of review of the Commonwealth Court in an enforcement proceeding of this nature. Finally, I believe the majority has reached issues which were unnecessary to the resolution of the lawsuits before us and that its decision to dispose of these questions

on the record before us was jurisprudentially unsound. I therefore dissent.

## I. SCOPE OF REVIEW

While the issue of the appropriate scope of review of the Commonwealth Court in an action for enforcement brought by the Commission under section 10 of the Pennsylvania Human Relations Act (Act) of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 960 (Supp.1978–79), is applicable to both cases, I will in this opinion discuss the question within the framework of the Philadelphia case since in that instance it provides the basis for my reaching a result different from that reached by the majority. It is, however, to be understood that in each instance the appropriate scope of review is the same in my judgment. The Commission contends, and I agree, that the "substantial evidence test" is the standard by which the Commonwealth Court was required to review the recommendations and findings of the Commission in this matter.

No area is more amenable to the administrative agency concept than that of human relations. Because of the pervasive and insidious nature of discrimination it can only be effectively attacked on a case-by-case basis by an agency that has developed an expertise in ascertaining its presence and in the designing of remedies to combat it.[1] This Court

---

1. This Court stated recently:

 "From the outset, we note that the Legislature, in an attempt to deal comprehensively with the basic and fundamental problem of discrimination, clothed the Human Relations Commission with authority to '. . . *take such affirmative action* including but not limited to . . . [several specific courses of action] *as, in the judgment of the Commission, will effectuate the purposes of this act, and including a requirement for report of the manner of compliance.*' Pennsylvania Human Relations Act, supra at § 9, 43 P.S. § 959 (Supp.1973) (emphasis added). The words 'as in the judgment of the Commission' indicate to us that the Legislature recognized that only an administrative agency with broad remedial powers, exercising particular expertise, could cope effectively with the pervasive problem of unlawful discrimination. Accordingly, the Legislature vested in the Commission, quite properly, maximum flexibility to remedy and hopefully eradicate the 'evils' of discrimination. Pennsylvania Human Relations Act, supra at

has recognized that courts, with their numerous areas of concern and their ever increasing case loads, are particularly unsuited to assume such a task:

"Moreover, having expressed its findings and goals in an early section, the Legislature undoubtedly envisioned a case-by-case approach to the elimination of racial imbalance in public schools. Most observers agree that when courts are forced to devise and supervise programs whose goal is the elimination of racial imbalance they are acting in an area alien to their expertise. These observers would prefer to see de facto segregation attacked by the community itself utilizing other organs of the government. The Human Relations Commission, whose function is to work with the parties to the dispute in an attempt to alleviate the source of the friction through 'conference, conciliation and persuasion,' and whose procedure is considerably more flexible than the courts, is, as the Legislature recognized, better equipped to deal with this problem than the courts. 'In each case, the interests protected by adherence to neighborhood attendance zones must be weighed against the substantiality of the racial imbalance in the community's schools. An agency such as the Human Relations Commission is best equipped to make these difficult judgments, and flexible enough to enter appropriate remedial orders.' "

*Pa. Human Rel. Com. v. Chester School Dist.*, 427 Pa. 157, 179, 233 A.2d 290, 301–302 (1967) (footnote omitted). The General Assembly established the Commission and charged it with the responsibility "[t]o formulate policies to effectuate the purposes of [that] act" and to "initiate, receive, investigate and pass upon complaints" charging unlawful discriminatory practices. 43 P.S. § 957 (1964 &

§ 2(a), 43 P.S. § 952(a) (Supp.1973). The legislative mandate that the provisions of the Act be 'construed liberally', noted supra, serves to reinforce this view.

We thus recognize that the expertise of the Commission in fashioning remedies is not to be lightly regarded."
*Pa. Human Rel. Com. v. Alto-Reste Park Cemetery Ass'n*, 453 Pa. 124, 133–34, 306 A.2d 881, 887 (1973) (footnote omitted) (emphasis in original).

Supp.1978–79). The Commission must first seek compliance through "conference, conciliation and persuasion." *Id.* § 956 (Supp.1978–79). If this approach proves inadequate, the Commission is then empowered to hold hearings, make findings of fact, and issue final orders. *Id.* Such final orders are reviewable under section 10 of the Act in accordance with the terms of the Administrative Agency Law, 71 P.S. § 1710.41 (1962 & Supp.1978–79). 43 P.S. § 960 (Supp.1978–79). Where an appeal of the order is taken pursuant to section 10 by an aggrieved party, it is clear that the Commonwealth Court has accepted that its scope of review is limited to the substantial evidence test.[2] In *Midland Hts. Homes v. Pa. Human Rel. Com.*, 17 Pa.Cmwlth. 563, 565–566, 333 A.2d 516, 517 (1975), that court stated:

2. The term, "substantial evidence" has been defined by the U. S. Supreme Court as follows:

"Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 299, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *See also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

In *Pa. Human Rel. Com. v. Feeser*, 469 Pa. 173, 364 A.2d 1324, 1327 n.9 (1976), we stated:

9. Section 10 of the PHRA, id. § 10, 43 P.S. § 960, provides that review of PHRC orders shall be in accord with the provisions of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, as amended, 71 P.S. § 1710.1 et seq. (1962). Section 44 of the Administrative Agency Law, id. § 44, 71 P.S. § 1710.44, sets forth the standard of review:

"[T]he court shall affirm the [agency] adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of sections thirty-one to thirty-five [relating to the procedure to be used at the administrative hearing] . . . have been violated . . . or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence."

See, e. g., *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A.2d 290 (1967); *Midland Heights Homes v. Pennsylvania Human Relations Commission*, 17 Pa. Cmwlth. 563, 33 A.2d 516 (1975); *General Electric Corp. v. Pennsylvania Human Relations Commission*, 18 Pa.Cmwlth. 316, 321, 334 A.2d 817, 821 (1975). See also, *Pennsylvania Human Relations Commission v. Alto-Reste Park Cemetery Ass'n*, 453 Pa. 124, 133–34, 306 A.2d 881, 887 (1973).

"As stated in Section 10 of the Act, 43 P.S. § 960 (Supp.1974–1975), our scope of review is governed by the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended*, 71 P.S. § 1710.1 et seq., whereby we are to determine whether the Commission's adjudication 'is not in accordance with law' or whether 'any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.' *See Wilkinsburg School District v. Pennsylvania Human Relations Commission*, 6 Pa.Cmwlth. 378, 295 A.2d 609 (1972).

Although on this record, we, if we had been the factfinders, might have reached a contrary determination, nevertheless, we must conclude that there is sufficient substantial evidence to support the Commission's findings of fact and conclusions of law."

I can find no justification for interpreting section 10 as allowing a broader scope of review where the Commonwealth Court is called upon to enforce the Commission's order than the court has in reviewing the propriety of the order in the first instance. Particularly where the requested enforcement only entails the court's review of the Commission's judgment that a submitted plan by the District is not in compliance with an order the court has already considered and found appropriate, I find no reason why that court should be allowed to substitute its judgment.[3] It is clear

---

**3.** Prof. Louis Jaffe, in his work, Judicial Control of Administrative Action (1965), made a searching inquiry into the judicial role in the enforcement of agency orders. The following passages are particularly enlightening:

"Occasionally the Supreme Court has characterized the district courts and courts of appeal exercising powers of judicial review and enforcement as 'courts of equity.' This has encouraged litigants to invoke the traditional broad powers of the chancellor to temper with mercy the harsh application of rules. The court will be asked to mitigate, remit, or suspend the sanction imposed by the administrative order or regulation. This appeal to the alleged equitable powers of the court ordinarily will fail; the court, if relief is granted, will seek to justify its action on the ground that the agency's action is in excess of statutory warrant. It must be admitted that to characterize the court as a 'court of equity' is not apt. The chancellor's jurisdiction is *broad* and *original*. But in our

ͺ

that the judgment in such a case is the type that is expected to be within the agency's expertise. Where the agency is forced to depend upon the courts for the enforcement function, the agency's role becomes merely advisory in nature if the court is allowed to substitute its judgment for that of the agency. Instructive on this issue is the language of this Court in *Com. Dept. of Environmental Resources v. Pa. Power Co.*, 461 Pa. 675, 693–95 & n.17, 337 A.2d 823, 832–833 & n.17 (1975):

"The confusion over that which transpired below lies in the fact that neither the Clean Air Act nor the Air Pollution Control Act anticipate that a court would prepare its own order to abate air pollution without 'agency assistance.' The Acts provide for an Administrative Process, *i. e.*, the application of state standards to specific sources through *agency* orders and a court's 'enforcing function' to compel compliance with such *agency orders.* *See* 35 P.S. § 4001 et seq. and 42 U.S.C.A. § 1857 et seq. Under these Acts, if an agency order or decision is challenged, review is limited to administrative review.

Here, unlike other cases in this area, the 'enforcing court,' in what appears to be a good faith attempt to

situation it is the agency which has original jurisdiction in the sense of the power to choose from among valid competing solutions. The reviewing court's basic role is to decide whether the chosen solution is valid."

· · · · ·

"There is a considerable body of law concerning judicial control of administrative remedies, most of it—in the federal sphere—dealing with the Labor Board and the Trade Commission. Though characteristically the agencies are allowed broad discretion in formulating remedies, the Supreme Court has developed principles of control. Thus the question may be raised whether the order bears an 'appropriate relation to the policies of the Act'; whether 'the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act', whether the Board has 'patently traveled outside the orbit of its authority so that there is, legally speaking, no order to enforce.' The concept most usually applied in testing the sanction imposed by the order is the distinction between what can be justified as appropriate to right the wrong and what cannot be so justified." *Id.* at 263, 267.

ameliorate an already drawn out conflict between PPC and the DER, formulated its own order, including its own commitment date. *'Agency input'* as anticipated by the statutes was never added and consequently *had not been reviewed."*

. . . . .

"It is important to note that the DER was given the opportunity to make a 'reviewable' decision but chose instead to file for contempt. Had the DER decided to pass on the acceptability of the PPC application, state administrative remedies would have become available and likewise court review of agency findings. *See North American Coal Corp. v. Air Pollution Commission,* 2 Pa. Cmwlth. 469, 279 A.2d 356 (1971); *Standard Lime and Refractories Company v. Department of Environmental Resources,* 2 Pa.Cmwlth. 434, 279 A.2d 383 (1971). Only in this context (pursuant to Pennsylvania Administrative Agency Law, 71 P.S. § 1710.4) would judicial review have been as limited as DER now suggests.[17]

[17] Review of an agency decision permits the court to ask only whether 'based on the full record before the agency, the agency's action was arbitrary capricious or an abuse of discretion.' *See Commonwealth v. Harmar Coal Company,* 452 Pa. 77, 306 A.2d 308 (1973); *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 109 A.2d 331 (1954); and *Bortz Coal Company v. Commonwealth,* 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971). Here, however, there was no decision on record by the agency.

The pertinent language of section 10 provides:

"When the Commission has heard and decided any complaint brought before it, enforcement of its order shall be initiated by the filing of a petition in such court, together with a transcript of the record of the hearing before the Commission, and issuance and service of a copy of said petition as in proceedings in equity. When enforcement of a Commission order is sought, the court may make and enter, upon the pleadings, testimony and proceedings set forth in such transcript, an order or decree enforcing, modifying and enforcing as so modified, or setting aside, in whole or in part, the order of the Commission, . ."

43 P.S. § 960 (Supp.1978–79).

This Court has stated:

"The canons of statutory construction require that a statute be read in a manner which will effectuate its purpose, a task which compels consideration of more than the statute's literal words. *E. g., Chartiers Valley Joint Schools v. Allegheny County Bd. of School Directors,* 418 Pa. 520, 211 A.2d 487 (1965); *Rossiter v. Whitpain Twp.,* 404 Pa. 201, 170 A.2d 586 (1961); *New York Life Ins. Co. v. Guaranty Corp.,* 321 Pa. 359, 184 A. 31 (1936); Act of May 28, 1937, P.L. 1019, 46 P.S. § 551. In ascertaining this legislative purpose, especially when the act in question is a manifestation of a fundamental policy of the Commonwealth, courts may properly consider the historical setting which gave impetus to its enactment. See *New York Life Ins. Co. v. Guaranty Corp.,* supra; *Orlosky v. Haskell,* 304 Pa. 57, 155 A. 112 (1931); 50 Am.Jur. § 295 (1944). Thus even if we assume arguendo that the interpretation we have adopted is not apparent solely from the wording of the statute, any latent ambiguity disappears once we examine the circumstances of its passage."

*Pa. H. R. C. v. Chester School Dist.,* supra, 427 Pa. at 166–67, 233 A.2d at 295. First, the language of the statute gives rise to an inference that the court should confine its consideration to the record as developed during the proceedings before the agency. I do not accept the majority's liberal interpretation which would permit the Commonwealth Court to take additional testimony. Second, there is nothing in the Act that suggests that the Commonwealth Court is at liberty to substitute its judgment for that of the Commission. As has been stated, the legislature clearly intended that the Commission serve as an organ to ferret out and eradicate discriminatory practices. If we interpret section 10 as allowing the Commonwealth Court to have a scope of review beyond the substantial evidence test, we are therefore again relegating the Commission to an advisory capacity only and

vesting in the court the ultimate judgment in these matters. To do so would clearly frustrate the legislative intention of creating an agency with the expertise in the area and vesting within that agency the power to carry out the purposes of the Act.

The United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), crystallized the responsibility of government to eliminate segregation within the schools of this nation. That concept, as it has evolved, has required that all reasonable methods be available to formulate an effective remedy. *North Carolina Board of Education v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Pa. H. R. C. v. Chester Sch. Dist., supra.* Any decision to require less would contravene the mandate that every effort must be made to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. *Davis v. Board of School Commissioners of Mobile Co.*, 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). *See also Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Moreover the fact that the realization of this responsibility first occurred in situations involving *de jure* segregation does not lessen the responsibility where offensive racial imbalance is present as a result of *de facto* segregation. *Pa. H. R. C. v. Chester Sch. Dist., supra* :

"In 1954, the Supreme Court of the United States ushered in a new era of constitutional development when it held segregated educational facilities deprived children of minority groups the opportunity to obtain an education equal to that received by their Caucasian counterparts. *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The consolidated cases decided in *Brown* involved areas where the state gave active support to a dual system of schools, and for several years the greatest emphasis was placed upon achieving compliance with the Supreme Court's mandate in the southern states. See, e.

g., *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958). However, Negro leaders recognized that their children were not receiving equal educational opportunities in northern communities, where the schools were frequently segregated on a de facto basis, and in the late fifties they began to focus their attention on this problem. See, e. g., *Taylor v. Board of Educ. of New Rochelle*, 191 F.Supp. 181 (S.D.N.Y.), aff'd, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961)." *Id.* 427 Pa. at 167, 233 A.2d at 295.

When the substantial evidence test is employed to the recommendation and request of the Commission in the Philadelphia case it is, in my judgment, evident that there was a rational basis for the position urged by the Commission, and that the Commonwealth Court abused its discretion in denying the Commission's request for enforcement.

The factual history in the Philadelphia case has been outlined in the majority opinion and I will not repeat it here. I do believe, however, that certain aspects should be emphasized and clarified. The majority opinion focuses upon the Commission's amended Final Order of September 25, 1972. This tends to obscure the fact that the order sought to be enforced by the Commission is for purposes of this case the same as the order it issued on June 7, 1971. This order came under judicial scrutiny when the School District of Philadelphia (District) took an appeal to the Commonwealth Court. That action resulted in an affirmance of the Commission's order as it relates to the matters presently before this Court.[4] In that decision the Commonwealth Court accepted the Commission's findings that there was *de facto* segregation in the District's pupil population.

4. The Commonwealth Court did remand the cause to the Commission. This action was necessitated by provisions in that order relating to requirements that the District adopt affirmative recruitment programs to correct de facto racial imbalance in the professional and non-professional staffs. The Amendment of the June 7, 1971 order to bring it into compliance with the Commonwealth Court's directive was accomplished by deleting all provisions relating to staff integration. *Sch. Dist. of Phila. v. Pa. Human Relations Com.*, 6 Pa. Cmwlth.Ct. 281, 294 A.2d 410 (1972).

It is also significant that the Order of June 7, 1971 anticipated the completion of a desegregation plan by the beginning of the 1974–75 school year. We have now completed the 1977–78 school year and a satisfactory plan has yet to be designed or implemented. When we consider that the discussions relating to the racial imbalance among the students within the District began in 1968, it becomes apparent that a decade has passed without a resolution of this urgent problem. In this setting of procrastination and delay the majority contends that it is reasonable to accept an entirely voluntary plan for desegregation of the system. Further, it condones withholding any mandatory measures until February 1, 1980.[5]

The essence of the Commission's objection is its unwillingness in face of the history of this litigation to accept the plan without mandatory features. Specifically, the assurances sought are that the District's plan should have included guarantees that a control would be maintained over admissions to program elements to stimulate desegregation; to guarantee an immediate realignment of school boundaries in contiguous attendance areas where racial imbalance exists; and a commitment by the District to a plan of involuntary desegregation should the proposed voluntary plan fail to accomplish the desired result. In view of the history of the case, the Commission's reluctance to consent to the plan offered was, in my judgment, a reasonable position.

The Commonwealth Court reasoned:

"In a 'manner of speaking, it might be said that the School District of Philadelphia became segregated by action of the people on a voluntary basis by their selection of their neighborhood of residence. It does not seem inappropriate, therefore, to attempt to achieve desegregation by the equally voluntary action of the people in the selection of the schools their children will attend.' "

---

**5.** The sincerity of the District is best gleaned from the plan offered by it in response to the Commonwealth Court's order of October 1, 1974. This plan called for the creation of a Metropolitan School District embracing Philadelphia and school districts in adjacent counties. The political obstacles in such a proposal should have been apparent to even the most naive.

*Pa. H.R.C. v. Sch. Dist. of Phila.*, 30 Pa.Cmwlth. 644, 647, 374 A.2d 1014, 1016 (1977).

This is the most blatant example of a court substituting its judgment for that of the agency charged with the responsibility of dealing with the problems in areas of its expertise. It also illustrates the danger of allowing courts to dabble in areas beyond their competence. The fallacy of this reasoning is so obvious that it should not require a response, however, since my brethren seem to be impressed, I am compelled to do so.

Unquestionably the segregated pattern in the school population is in large measure reflective of a segregated residential pattern. It is, however, erroneous to assume that the selection of residence in America today is the "voluntary" choice of all of the citizens of this society. One of the recognized evils of racial prejudice is that it forces those subjected to its insidious poison to accept housing which is substandard and located in the least desirable sections. Discrimination deprives minorities of the freedom of choice in the selection of their residence that most members of majority classes possess.

"There are many social and economic causes for the rigidified residential patterns which dominate our communities, and despite anti-discrimination laws the barriers to integrated housing are often difficult to breach. Indeed the way to attack discrimination in housing and employment may be to begin with a program of quality integrated education. The best way to demonstrate the 'inherent worth of [one's] neighbor' is to place individuals in a situation where they are exposed to their neighbor. This is especially true if a child can become aware of his neighbors' capabilities before his prejudices have had a chance to develop, but inter-racial cooperation may also have a beneficial effect on the thinking of adults. Thus, participation in such school activities as the P.T.A. may promote a better understanding which is the crucial first step toward the achievement of a truly integrated society. To paraphrase Mr. Justice HOLMES, one such experience may be worth several volumes of sociology." (footnote

omitted) *Pa. H.R.C. v. Chester Sch. Dist., supra,* 427 Pa. at 170–71, 233 A.2d at 297.

To me it is more reasonable to adopt the Commission's view that since the racial imbalance in our school population is, in large measure, created by involuntary residential patterns forced upon the minority members of the community, it is not inappropriate to impose involuntary measures upon the school district majority to alleviate these conditions. In making this statement, I am particularly aware that one of the dominant concerns of those seeking restrictive and exclusive residential patterns is the racial complexion of the school *their* children will be attending. To remove the exclusivity of the school population would, in my judgment, assist in large measure in overcoming the present resistance to change in the residential patterns.[6]

6. I am not unmindful of those who place the neighborhood school system on a preferred pedestal. My response to them is the statement of Mr. Justice ROBERTS in *Pa. H.R.C. v. Chester Sch. Dist., supra* :

"The argument that the Commission's order will destroy the neighborhood school system completely distorts the historical rationale of neighborhood schools. Traditionally, the neighborhood school has been an exercise in democracy, 'a single structure serving a heterogeneous community in which children of varied racial, cultural, religious, and socio-economic backgrounds were taught together—the proverbial melting pot.' One educator has recalled: 'Most men and women over 40 recall a childhood schooling in which the sons and daughters of millowners, shop proprietors, professional men, and day laborers attended side by side. School boundaries, reaching out into fields and hills to embrace the pupil population, transcended such socio-economic clusterings as existed.'

However, increasing population density in our nation's urban areas have caused neighborhoods to shrink drastically until today convenience is the most common justification for school attendance zones. Thus, 'because of rigid racial and socio-economic stratification, ethnic and class similarity has become the most salient present-day neighborhood characteristic, particularly in urban areas. The neighborhood school, which encompasses a homogeneous racial and socio-economic grouping, as is true today, is the very antithesis of the common school heritage.' Rather than neighborhood schools, we have all too frequently developed a system of ghetto schools. Integration need not see the demise of neighborhood schooling, although unquestionably new patterns of districting will have to occur."

Therefore, I am of the view that it cannot be said that there was not a reasonable basis for the Commission's disapproval of the plan submitted by the Philadelphia School District. Under the substantial evidence test the Commission's position should have been sustained and the plan presently before the Court rejected.

## II. JURISDICTION

I also take exception to the majority's disposition of the jurisdictional question in this case (majority op. at 1244–1245). The parties did not press the jurisdictional issue before this Court, and there is no dispute that this Court has general subject matter jurisdiction over the instant case. The underlying question involves the root of that jurisdiction, i. e., whether this Court's review should be jurisdictionally based upon section 203 of the Appellate Court Jurisdiction Act, 17 P.S. § 211.203 (Supp.1978–79), or upon the discretionary jurisdiction authorized by section 204(a), *id.* § 211.204(a). In my view, it is unwise for the majority to resolve such an important question without the benefit of thorough briefs and arguments by the litigants.[7]

## III. THE MANDATE IN THE PITTSBURGH CASE

My final point of contention concerns the majority's mandate in the Pittsburgh case. Preliminarily I note that I still

*Id.* 427 Pa. at 174–75, 233 A.2d at 299, *quoting* Carter, De Facto School Segregation: An Examination of the Legal and Constitutional Questions Presented, 16 West-Res.L.Rev. 502, 507 (1964); Racial Isolation in the Public Schools, 40 (U.S. Comm. on Civil Rights, 1967). (footnote omitted).

Today, heterogeneity is not the economic and social difference, but rather the ethnic, religious and racial differences that exist in our present community. The true neighborhood concept is one reflective of our present population where each student has the benefit of the association of those with whom he must compete in the life which he is preparing to enter.

7. The majority reaches its result on the jurisdiction question relying on the implicit premise that the enforcement proceeding under section 10 is an independent, separate and distinct proceeding. If, however, you view the entire proceeding as commencing with the administrative action below (conciliation, conference, complaint, hearing and order) the appeal of that order and the subsequent enforcement, the majority reasoning appears erroneous.

adhere to this Court's holding in *Pa. H.R.C. v. Norristown Area School Dist.*, 473 Pa. 334, 374 A.2d 671 (1977), that the Commission's Recommended Elements are not inflexible administrative regulations but rather are advisory guidelines. In keeping with this holding, the majority today remands the Pittsburgh case to the Commonwealth Court with instructions to modify its order in a manner consistent with the majority opinion. The majority then goes into considerable detail as to the nature and extent of the mandated modification.[8] I am of the opinion that such a mandate is totally unnecessary, is wasteful of judicial resources, and creates the possibility of further appellate review and the delay attendant thereto.

This Court has thoroughly considered the allegations and arguments of all parties to this appeal and is therefore in an excellent position to modify the order itself in precisely the manner in which it directs the Commonwealth Court to act. *See* note 8, *supra.* There can be no doubt that this Court is empowered to modify lower court orders, and considering the interests of judicial economy and avoidance of delay in a matter of grave significance to the citizens of Pittsburgh, I can find no justification for placing another judicial hurdle in the path of final resolution of this case. It is at least conceivable that the Pittsburgh Board of Education may be dissatisfied with the Commonwealth Court's modified order. In such an event, the Board may again elect to appeal to this Court on the grounds that the court's modified order is inconsistent with today's majority opinion. If I understand the majority's jurisdictional discussion, this Court would

**8.** The majority states:

That order should make clear the District's obligation to prepare and submit a plan which addresses the problem of school desegregation in good faith and in realistic fashion. The District's Plan should take into account the Recommended Elements and the significance they will have for the deliberations of the Commission in its review of the plan. The order should, however, provide some degree of flexibility in recognition of the fact that a plan which fails to satisfy some aspect of the Recommended Elements may prove acceptable if the District demonstrates that substantial and persuasive justification exists for any such departure.
Majority op. at ——.

then be compelled to entertain such an appeal, because under the majority view section 203 of the Appellate Court Jurisdiction Act, 17 P.S. § 211.203 (Supp.1978–79), governs the instant case. This possibility of further appellate review could be avoided if this Court itself would simply modify the Commonwealth Court's order.

The parties have had their day or days in court, and it is now time for them to move forward in the process of providing a racially integrated school system for the children of Pittsburgh. The majority's mandate merely sows the seeds for the future frustration of that process.

ROBERTS and MANDERINO, JJ., join in this dissent.