Pennsylvania Human Relations Commission *v.* Board of Education of The School District of Pittsburgh.

Argued June 2, 1981, before President Judge
CRUMLISH and Judges MENCER, ROGERS, BLATT, CRAIG,
MACPHAIL and WILLIAMS, JR. Reargued February 2,
1982, before President Judge CRUMLISH and Judges
ROGERS, BLATT, WILLIAMS, JR., CRAIG, MACPHAIL and
DOYLE.

*Frederick A. Boehm,* with him *Thomas M. Rutter,
Jr., Goehring, Rutter & Boehm,* for School Board.

*Ellen M. Doyle,* Assistant General Counsel, with
her *Robert S. Mirin,* General Counsel, for Commission.

*David Max Baer,* with him *Gary R. Truitt, Hilner, Baer, Truitt & Fraas,* for Amicus Curiae, The National Association for Neighborhood Schools of Pittsburgh, Inc. et al.

*Thomas M. Kerr,* with him *Jon G. Hogue* and *Judith L. Maute, Titus, Marcus & Shapira,* for Amicus Curiae, Interracial, *Ad Hoc* Group of Parents and Taxpayers.

OPINION BY JUDGE CRAIG, April 20, 1982:

The Pittsburgh Board of Public Education initiated this original jurisdiction proceeding by its petition for an evidentiary hearing to establish its alleged compliance with school desegregation orders, to which the Pennsylvania Human Relations Commission filed its answer and an application to hold the Board in contempt for non-compliance.

Although the record herein has established quite clearly that the Pittsburgh Board has not yet achieved 100% desegregation, as defined by the Commission, it is also quite clear that the Pittsburgh Board has taken an important step by moving from its initial voluntary plan[1] to a compulsory desegregation program pursuant to our 1977 and 1978 orders.[2] The Amended Plan, now before us, employs busing of more than one out of every three students in the system, involving black and white students in equal numbers. The Amended Plan has resulted in the reorganization of the grade structure system-wide, by the closing of 15 elementary schools, and by redistricting 12 elementary schools, as

---

[1] Developed pursuant to Commission orders approved in part in *Pittsburgh School District v. Human Relations Commission,* 6 Pa. Commonwealth Ct. 281, 294 A.2d 410 (1972).

[2] *Human Relations Commission v. Pittsburgh School District,* 28 Pa. Commonwealth Ct. 154, 367 A.2d 829 (1977), affirmed in part, 480 Pa. 398, 390 A.2d 1238 (1978).

well as other measures. The Pittsburgh Board has achieved total desegregation compliance at the middle school level.

Without destroying the benefits thus far achieved by all the members of the Pittsburgh Board and by the Commission,[3] our obligation is to consider the attainability of even fuller compliance with the Recommended Elements and guidelines of the Commission which have been long accepted in these proceedings as reasonably defining the goals, with awareness that the Pennsylvania Supreme Court requires "some degree of flexibility in recognition of the fact that a plan which fails to satisfy some aspect of the Recommended Elements may prove acceptable if the District demonstrates that substantial and persuasive justification exists for any such departure." *Human Relations Commission v. Pittsburgh School District*, 480 Pa. 398, 419, 390 A.2d 1238, 1248 (1978).

The Commission, in its pleadings and brief, has not brooked any departure by the Pittsburgh Board from the state's percentage definition of a desegregated high school, between 28% and 53% black, and of a desegregated elementary school, between 36% and 68% black; the Commission's argument rejects the Pittsburgh Board's attempt to employ a 5% or 10% leeway on either side. However, as noted below, the Commis-

---

[3] As indicated in the findings which follow, all members of the Pittsburgh Board—both majority and dissenting members—deserve encouragement for their moves in the right direction, forged by their earnest debate in many public hearings. The patience and input of the Commission and its staff has also contributed greatly.

However, the people of Pittsburgh and Mt. Oliver—most particularly the students in the system and their parents—also deserve commendation for such advances as have been achieved. (We have judicial notice of the initiation of the Amended Plan pending our decision, by reason of the fact that the Commission, after the main hearing, asked this court to enjoin its implementation in September, 1980, which we declined to do.)

sion itself, in listing further changes, has proposed results which would transgress its own guidelines. We are hard put to conclude that the Commission may insist on exactitude for the Pittsburgh Board as to the guideline numbers, but not for itself. Moreover, the Commission, by finding justification for noncompliance as to 13 elementary schools and at least 3 high schools, clearly acknowledges that compliance must be less than total.

If we accept the Commission's stated percentage limits as the legal guidelines, on the ground that there must be some basic references and because the Pittsburgh Board has not contested those percentages in legal terms, a study of the testimony and exhibits make it clear that this court cannot safely issue a pat solution by simply adopting the additional recommendations—the "Proposal"—which the Commission presented one week before the hearing at Judge WILKINSON's suggestion, as a group of *illustrations,* rather than as absolute and final requirements. A dissenting Pittsburgh Board member, testifying as a Commission witness, stated that the Proposal was to be taken "as a general indication of what could be done . . .", not "100% literally."

Therefore:

1. One hundred percent adherence to the rather mechanical percentage definitions of desegregation cannot be mandated when the Commission itself agrees that such total adherence is unattainable.

2. We cannot mandate absolute adherence to the Commission's quickly-developed Proposal when the Proposal, as regarded even by dissenting Pittsburgh Board members, was intended only to state 'general indications' of what can be done further.

3. This court certainly cannot mandate specifically the execution of any item in the illustrative Proposal by the Commission which would result in any desegregated school becoming segregated according to the Commission's own percentage definitions, although we certainly should not prohibit any such steps, where the Commission and the Pittsburgh Board agree that a lesser degree of segregated status would be preferable.

Because these proceedings — the Pittsburgh Board's petition for evidentiary hearing and the State's application for contempt—have been addressed to our original jurisdiction, *Human Relations Commission,* 480 Pa. at 411, 390 A.2d at 1244,[4] and because this court has conducted an evidentiary hearing covering the whole matter, we have the power and duty under Pa. R.A.P. 106 to make findings of fact and conclusions of law, precisely as we did in the opinion by Judge ROGERS in *Human Relations Commission v. Philadelphia School District,* 23 Pa. Commonwealth Ct. 312, 352 A.2d 200 (1976). Both sides, with the acquiescence of the hearing judge, submitted written requests for findings of fact and conclusions of law.

The findings and conclusions supported by the record will be stated after preliminary discussion.

## DISCUSSION

We must first assess the extent of compliance accomplished by the Amended Plan and then the extent of justification, if any, for such noncompliance as remains.

---

[4] *Midland Heights Homes v. Pennsylvania Human Relations Commission,* 17 Pa. Commonwealth Ct. 563, 565-66, 333 A.2d 516, 517 (1975) is not applicable because that case involved an *appeal* from a final order of the Commission.

The unattainability of absolute compliance is forthrightly acknowledged in the Commission's illustrative Proposal by an Exhibit J listing 13 elementary schools which the Commission would allow to remain out of strict numerical compliance, with the Commission's stated justification for each.

Hence, we cannot properly hold the Pittsburgh Board to be in contempt upon the basis that compliance is less than total in terms of the Commission's percentage standards.

Moreover, with respect to compliance determination, the record reveals some confusion as to percentages, one example being Schenley High School. Testimony by dissenting Board Member Vitti, as a Commission witness, and the Commission's Proposal both describe Schenley as 77% black, but the correct percentage for Schenley apparently is 87% black, as confirmed by the Commission's own Exhibit L, prepared by the same Commission staff member. (Commission counsel has thoughtfully appended to the brief an updated school membership report as of September, 1979 and 1980 which, although not of record, is consistent with Commission Exhibit L.)

This problem of accuracy, understandable in the midst of many numerical details, illustrates why we cannot adopt the Commission's Proposal wholesale or otherwise specify further moves in a rigid manner.

### Middle Schools

Total compliance has been achieved with respect to desegregation at the middle school grade level (6-8). Although no more than is required by law, that achievement must be recognized as a product of extensive redistricting and reassignment, as well as very substantial capital expenditures. The middle school result is acknowledged by the minority report of the Pittsburgh Board's dissenting members, one of whom,

Dr. Engel, testified that, at least initially, he had "accepted" the middle school approach "as a planning assumption." Of course, the middle school pattern, despite its compliance in itself, remains an important subject for attention because of its inevitable continuing relationship to the good and bad points of the elementary school pattern in the plan.

## High Schools

The Commission's pleadings and letter responses (e.g. Exhibit A-2) averred that the Amended Plan would leave 6 high schools[5] out of compliance, expressly naming Carrick and South (as "white-segregated") and Westinghouse and Schenley (as "black-segregated"). The Commission does not discuss the remaining two, seemingly because their black student percentages are anticipated to be moving to a point within the Commission's guidelines.

As to Carrick, the Commission grants "justification" because its attendance area is located so far toward the south edge of the city that merger of its attendance area with a black-segregated high school is not feasible.

Accordingly, only Schenley, Westinghouse and South remain to be considered. The Pittsburgh Board acknowledges non-compliance as to Schenley and Westinghouse, claiming, however, that the magnet program at Schenley and a feeder pattern reassigning former Schenley students to Allderdice will benefit Schenley's status.[6] The Pittsburgh Board's claim is

---

[5] The Commission consistently regards the present total number of high schools to be 13. The Pittsburgh Board consistently gives the present total as 12. Our job has not been made any easier by the parties' failure to be consistent as to a simple numerical total.

[6] Comparison of Commission Exhibits L and P indicate slight movement in the right direction on that score, with the Schenley black student percentage decreasing very slightly (1%) over a one-

coupled with its plea, as to all schools, for time to evaluate further the effect of the magnet schools program and the determination of additional school closings to be carried out.

The Commission's Proposal, which would deal with South and Schenley by closing South and combining it with Schenley, cannot be approved uncritically because it suffers from the above-mentioned error of regarding Schenley as 77% black, leading to a Commission conclusion that a 50% balance would result. However, using the correct Schenley percentage of 87% black and the actual 1979-80 student number totals from Commission Exhibit L, it appears the result would be 58% black, an improvement, but still outside the Commission's numerical guidelines.

Similarly, the Commission's Proposal would combine Allerdice with Westinghouse, so that, according to the Commission, the result would be a 57% black combination, also outside the mechanical guideline percentages.[7]

In view of the Commission's refusal to allow the Pittsburgh Board as much as a 5% leeway, the Commission's own Proposal must be re-evaluated, at least preliminarily, against its own standards.

As to Westinghouse, the Pittsburgh Board contends that there are no solutions, other than those which would place additional high schools outside the guidelines, or the use of the overly-remote Carrick attendance area. The Pittsburgh Board cites *Human Relations Commission v. School District of Philadelphia*, 30 Pa. Commonwealth Ct. 644, 647, 374 A.2d 1014, 1016 (1977) for the point that voluntary desegregation programs will be considered more fully in situations

year period. South also is apparently moving into compliance in itself.

[7] This computation by the Commission is also at variance with figures in some exhibits.

which, like Westinghouse, arise from racial housing patterns.

However, it is to be noted that Commission Exhibit A-5 also suggests still another alternative for Westinghouse, conversion "to an all-magnet school to be kept non-segregated by racial admission controls."

Significantly, the important Community Advisory Committee has also recommended consideration of two similar alternative solutions for Westinghouse.

Thus, as to the high schools, so-called "justification", as acknowledged by the Commission, for remaining outside the guidelines appears to exist as to three. The record supports an order by us for further consideration as to Schenley, South and Westinghouse, but to mandate the particular steps in the Commission's illustrative Proposal would not be sound, when the Commission and the Community Advisory Committee have envisioned alternatives.

### Elementary Schools

The parties do agree upon the total number of elementary schools in existence under the Amended Plan —56. According to the Commission's view and averments, 32 of them are still outside the percentage guidelines. (The Pittsburgh Board, by urging a 5% leeway, arrives at approximately 22.)

However, as noted above, the Commission grants certain stated justifications with respect to 13 of the 32. For example, the topography of Whittier and Beechwood makes them not feasible for school bus access; Morrow, Westwood, Shaeffer, Overbrook and East Hills are close, or moving close, to compliance; King and McCleary are magnet schools with enrollment controlls; Mifflin is in a southerly panhandle, too remote from black schools, and Belmar in the East End and Vann and Madison in the Lower Hill are too remote from white pupil areas.

The testimony of the dissenting members of the Pittsburgh Board, which focused mostly upon the elementary school situation, provides insight which is helpful, both as to justifications for the exemption of some schools from further action and as to corrective action with respect to the 19 remaining. For example, Board Member Dr. Milliones acknowledged some of the Commission's exemptions, noting that "all of the schools in the City do not have to be desegregated" and that "four or five all-black schools, that are high achieving schools" create "no problem . . . remaining segregated in the context of an entire plan;" he gave Vann, Madison, Belmar and Beltzhoover as examples.

The dissenting members' testimony, and that of other Commission witnesses, effectively disputed the existence of any reasonable basis for the Pittsburgh Board's majority view that elementary students should not be bused across Pittsburgh's rivers. One can scrutinize the record in vain for any proof or rationale to support this majority policy as a further limitation upon the 45-minutes and 9-miles one-way travel limitation accepted by both sides.

The dissenting members' testimony also voiced a concern that the Amended Plan was inequitable or unfair, emphasizing that concern more strongly than mere quantitative issues as to numbers of schools.

The minority report of the Pittsburgh Board, although acknowledging the existence of "an equal sharing of busing between black and white at the elementary level," nevertheless stressed their view as to "the inequity of the disproportionate number of blacks going into white neighborhoods," giving one-way busing black students from Murray to Brookline as an additional example.

In addition, the minority members claimed that, although busing is racially equal in numerical terms, busing assignments tend to involve poorer white fam-

ilies to a greater extent than whites of more substantial economic status—thus producing economic inequality despite the racial equality. This conclusion appears to be based upon the Board members' general knowledge of the relative affluence of various neighborhoods, certainly amounting to hypotheses on which research could be based, but this court cannot make a finding of fact, without more specific proof, based upon an hypothesis or an "uncomfortable impression" that white children from low income families are being transported more readily.[8]

Similarly, the record contains no evidence of probative worth to support the Pittsburgh Board's "white flight" hypothesis, the opinion voiced by its expert witness that stability of the racial composition of the school system would be destroyed by an exodus of almost all white students to white private schools if a "near total" adherence to the desegregation guidelines is demanded. The expert consultation on this point was obtained by the Pittsburgh Board, not at the time of its development of the Amended Plan, but only in connection with preparation for our hearings; it was based upon hypothesis and theory, rather than upon hard-minded market research studies using technological tools which have provided definitive results in many other fields. Our rejection of hypothetical views as to white flight or tipping does not mean that the actual direction of population and school composition changes which have occurred must be ignored. Both the Commission and the Pittsburgh Board have taken note of such actual trends, quite properly, in reaching many of their decisions and recommendations.

---

[8] *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1 (1973) clearly requires a fairly specific definition and identification of the poorer class to make out a case of economic discrimination, refusing to equate the poorest property districts fully with the poorest families.

In dealing with the 19 elementary schools which must be further considered (not in isolation from elementary schools already deemed desegregated, of course), to be particularly noted is Northview Heights, an all-black school in the North Side, and a similarly all-black school, Fairywood, in the West End, both of which are located in mostly black public housing areas but fairly close to substantially white schools. (There is some irony in the fact that certain public housing areas in Pittsburgh, formerly integrated, ceased to be such, in the early 1960's, as a result of the law's then understandable demand that no racial identification controls should be administered in the face of a family's need for decent housing.)

The interdependency of all moves is apparent. For example, the Commission's demonstrative proposal to combine Northview Heights with Spring Garden, as well as with Chatham, was, in the testimony, deemed now acceptable by dissenting Pittsburgh Board Member Vitti, for that district, who admitted formerly taking the stand that, "No, you can't have Spring Garden."

With respect to moving toward maximum desegregation with equity in the case of the elementary schools, the Commission's Proposal appears to be useful and deserving of thorough consideration. At least two of the dissenting Board members testified that they had recognized in it a distillation of various other plans which had been tendered, some by community groups. However, although the dissenting Pittsburgh Board member witnesses found the Commission proposal to be fair and beneficial and useful, they did not regard it as definitive. Of course, they had little time to study it; Dr. Engel stated that he "didn't do a great deal of study" on it. As Judge WILKINSON saw that witness' reaction, the committee Proposal was essentially an "out of focus picture of what might be done."

Therefore our order should permit all parties, with respect to the 19 elementary schools and the assurance of equitable and fair reassignment and busing approaches, to bring the Commission's suggestions and other alternatives into focus with the present time, recognizing that we are dealing with the dynamics of a large school system in which population movements and school closings or modifications never cease.

## FINDINGS AND CONCLUSIONS

On the basis of the extensive testimony and comprehensive exhibits submitted by the parties, we adopt findings of fact and conclusions of law as requested. Leaving out requested findings which are merely descriptive of the history of the case or the law (Pittsburgh Board Requests 1, 2, 3, 8, 17, 18, 33-35; Commission requests 1-7, 15, 16), the record supports the following:

### Findings of Fact

1. The Commission, pursuant to hearings held July 20, 21 and 27, 1979, rejected the original Pittsburgh Desegregation Plan, outlined its objections and granted a period, later extended, in which to amend it. (Commission Requests 8-11).

2. After the Pittsburgh Board submitted the Amended Plan, the Commission also rejected it for the stated reasons that, although all middle schools would be desegregated, an excessive percentage of the high schools and elementary schools would remain segregated, without substantial and persuasive justification, applying the Commission's percentage definitions and totals. The Commission also claimed that black-segregated school areas abutted those of white-segregated schools, some all-black schools were left in areas predominantly white and that more black than white pupils were "reassigned" by the plaintiff. (Commission Requests 11-14).

3. The Pittsburgh School District consists of 74 distinct neighborhoods (500 to 21,000 population each) situated in topography dominated by hills, rivers and bridges. (Pittsburgh Board Requests 4, 5)

4. Pittsburgh's total population, 520,000 in 1970, most recently is reported at 410,000 with school population at 48,795 in 1979-80, a drop of 2900 from the previous year, with student population projected to drop 2568 students further to 46,228 in September 1980. By straight-line projection, the school population would be 37,158 in 1985. (Pittsburgh Board Requests 9-11)

5. The ratio of black and white students currently is 48% black and is projected to be 54% black in 1985. (Pittsburgh Board Request 12)

6. The Pittsburgh Board, which had historically operated with a very diverse grade structure, moved under the Amended Plan to accomplish a uniform grade classification of elementary schools (K-5), middle schools (6-8) and high schools (9-12), by assigning more than 3000 students from grades 6, 7 and 8 in 33 elementary schools to 10 middle school buildings, as of September 1980. (Pittsburgh Board Requests 13-16, 19, 20)

7. The Amended Plan redistricts 12 elementary schools, affecting 4700 pupils, closes 15 elementary schools and, as a result of school closings or redistricting, transfers 3869 elementary students, 1980 of them black and 1880 of them white. (Pittsburgh Board Requests 23-25)

8. Under the Amended Plan, all students in the 10 middle schools (grades 6 to 8) will be attending schools that are desegregated. (Pittsburgh Board Request 30)

9. The Amended Plan continues the magnet school program in some high schools, some middle schools and

some elementary schools, controlling enrollment at magnet schools on a 50/50 or 60/40 black-white ratio basis. As of July, 1980 4600 students had qualified for the magnet school program. (Pittsburgh Board Requests 22, 27, 29)

10. Under the Amended Plan, approximately 17,800 students will be bused for desegregation purposes (as distinguished from private and special school busing), consisting of 36% of the 48,000 students, a mandatory busing program more substantial than most other cities. As to number of students bused, the busing program does not discriminate as to race; of the students bused for desegregation purposes, 8860 are black and 8940 are white. No study of evidentiary value exists to support the view that the busing program is discriminatory as to the economic status of students involved. (Record)

11. According to the Commission, further desegregation action as to 13 elementary schools is not now required, for justifications deemed satisfactory by the Commission. (Commission Exhibit J)

12. Out of the total of 56 elementary schools, 19 therefore remain outside of the guidelines. (Commission Exhibit J)

13. Justification as to those 19 has not been supplied either by the Pittsburgh Board's refusal to bus elementary students across rivers or by its expert evidence as to "white flight." (Record)

14. Accepting the most optimistic prediction of the success of the magnet school programs, the Amended Plan desegregates 10 of the 13 high schools, leaving 3 segregated. (Commission Request 17)

15. According to the Commission's count, as of September 1980, 6 high schools were not desegregated according to the Commission's guidelines. (Commission Exhibits A-1, J, K)

16. Of those 6 high schools, the status of South, Schenley and Westinghouse warrant further action at this time.

17. If South High School (28% black) is closed and combined with Schenley High School (87% black) the resulting combination would be 58% black and therefore not desegregated according to the Commission's guidelines. The Commission's proposal that Allderdice, now desegregated, be combined with Westinghouse, now segregated, would produce 57% black students in each, thus segregating both by the State's percentage guidelines.

18. Construction activities by the Pittsburgh Board in recent years, involving approximately $100 million, have substantially promoted desegregation, including the construction of Brashear High School, Greenway Middle School, Reizenstein Middle School and the expansion of Carmalt and Westwood elementary schools. (Pittsburgh Board Requests 48-53)

19. The more immediate cost of implementing the Amended Plan is approximately $1,500,000 for school renovation or conversion and $865,000 for in-service seminars and workshops, as well as $1,000,000 for additional busing. (Pittsburgh Board Request 54)

20. Although it was estimated that the Pittsburgh schools would lose 12 to 15% of white pupils as a result of the implementation of the Amended Plan, the decrease in white pupils was less than half that. (Commission Requests 27, 28)

21. There is no factual justification for not busing elementary students across rivers.

Conclusions of law indicated are:

*Conclusions of Law*

1. The court has jurisdiction.

2. Because the Pittsburgh Board has evidenced good faith by adopting and implementing a substantial

compulsory plan which has achieved full compliance as to middle schools and progress at other levels, the Pittsburgh Board has not acted contemptuously and should not be adjudicated as being in contempt of court.

3. Although the Amended Plan takes into account the Recommended Elements of a School Desegregation Plan issued by the Commission, there has not been total compliance with those recommended elements.

4. Adequate evidence has been adduced that justification exists for departure from the Commission's guidelines with respect to Carrick High School, Perry Traditional Academy and the special high school, and as to 13 elementary schools.

5. Insofar as the Amended Plan achieves compliance with this court's order of November 8, 1978, its implementation should be maintained.

6. Insofar as the Amended Plan does not comply, further modification should be required.

7. Requiring a compulsory desegregation plan which mandatorily assigns and buses students on the basis of race is not an unlawful or unconstitutional means to remedy de facto segregation.

8. The application of programs to maintain racial balance in magnet programs and newly opened schools is legal and constitutional.

### Order

Now, April 20, 1982, it is hereby Ordered that:

1. The application of the Board of Public Education of the School District of Pittsburgh (Pittsburgh Board) for a determination that the Pittsburgh Desegregation Plan, as revised by the Amended Plan dated March 14, 1980, constitutes full compliance with this court's order of November 8, 1978, requiring a definitive plan to correct racial imbalance in schools of the City of Pittsburgh, is refused;

2. The application of the Pennsylvania Human Relations Commission (Commission), requesting that the Pittsburgh Board be held in contempt of court, is refused; and

3. The request of the Commission that this court order the Pittsburgh Board to make further improvements in the Pittsburgh Desegregation Plan is granted, and the Pittsburgh Board is hereby ORDERED to amend and further modify the Pittsburgh Desegregation Plan to correct racial imbalance, provided that such modifications do not result in any desegregated school becoming segregated according to the Commission's stated percentage guidelines, as follows:

a. As to South, Schenley and Westinghouse High Schools, giving consideration, in the light of current facts and data, to the alternative solutions set forth by the Commission and by the Community Advisory Committee, and to any other alternative means for compliance;

b. As to the 19 elementary schools identified as remaining segregated according to the Commission percentage guidelines, in the light of current facts and data, giving consideration to the Commission's Proposal for Additional Desegregation of Pittsburgh Schools identifying such 19 elementary schools, to the recommendations of the Community Advisory Committee, and to any other alternative means for compliance;

c. In view of the overlong period of time which has already transpired in this matter, the Pittsburgh Board shall comply promptly with this order by submitting a definitive plan or plans for such compliance to the Commission on or before July 1, 1982, which submission may include alternative solutions provided that the same are specifically delineated.

This court shall retain jurisdiction until further order of court.

This decision was reached prior to the resignation of Judge Mencer.